UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIDGETT LORAINE NORRIS,

        Petitioner,

    v.

SUSAN DAVIS,

        Respondent.

_____/

CASE NO. 05-CV-60126-AA
JUDGE JOHN CORBETT O'MEARA
MAGISTRATE JUDGE PAUL J. KOMIVES

## REPORT AND RECOMMENDATION

*Table of Contents*

I.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.   REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    C.    *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    E.    *Sufficiency of the Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    F.    *Evidentiary Claims (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        1.    *Prior Bad Acts Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        2.    *Confrontation Clause and Hearsay Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    G.    *Jury Instructions (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
            a. Hearsay Testimony Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
            b. Voluntary Manslaughter Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    H.    *Denial of Application for Leave to Appeal (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    I.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
III.  NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.      *Procedural History*

        1.      Petitioner Bridgett Loraine Norris is a state prisoner, currently confined at the Huron Valley Complex for Women in Ypsilanti, Michigan.

        2.      On April 24, 2003, petitioner was convicted of one count of first degree premeditated murder, MICH. COMP. LAWS § 750.316(1), and one count of possessing a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Jackson County Circuit Court.  On May 8, 2003, she was sentenced to a mandatory term of life imprisonment without possibility of parole on the murder conviction, and to a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

        3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

        I.      THE EVIDENCE IS INSUFFICIENT FOR GUILT ON A 1ST-DEGREE PREMEDITATED MURDER CHARGE.

        II.     THE TRIAL COURT REVERSIBLY ERRED IN ADMITTING OTHER ACTS EVIDENCE AND IN ADMITTING HEARSAY STATEMENTS ALLEGEDLY MADE BY THE DECEASED VICTIM, THEREBY DENYING THE DEFENDANT'S CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND TO CONFRONTATION.

        III.    THE TRIAL COURT REVERSIBLY ERRED IN DENYING THE DEFENSE REQUEST(S) FOR JURY INSTRUCTIONS ON THE ALLEGED HEARSAY STATEMENTS MADE BY STINSON AND ON MANSLAUGHTER.

The court of appeals found no merit to petitioner's claims, and affirmed her conviction and sentence.

*See People v. Norris*, No. 248784, 2004 WL 2238593 (Mich. Ct. App. Oct. 5, 2004) (per curiam).

2

4.      Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court.  On January 4, 2005, the Clerk returned petitioner's application for leave to appeal without filing, for failing to file the appeal within 56 days of the court of appeals's decision.

5.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on June 3, 2005.  As grounds for the writ of habeas corpus, she raises the three claims that she raised in the Michigan Court of Appeals, as well as an additional claim challenging the Michigan Supreme Court's rejection of her application for leave to appeal as untimely.

6.      Respondent filed her answer on December 2, 2005.  She contends that petitioner's claims are barred by petitioner's procedural default in the state courts, and are without merit.

B.      *Factual Background Underlying Petitioner's Conviction*

The facts underlying petitioner's conviction were accurately summarized in petitioner's brief on direct appeal in the Michigan Court of Appeals:

> At about 9:22 p.m. on September 5, 2002, Stephanie Stinson called the local 911 operator and asked that the police be sent to the North Side Party Store.  *Tr Trial Proceedings of 4-22-03, Vol I, 167*.  Stinson told the operator: "Bridgett Norris.  This is Stephanie Stinson.  I was walking down the street, and I'll be damned if she didn't jump out, get out of the car and hit me in my mouth.  As soon as I get a restraining order, I ain't going to bet who's going to be (inaudible)."  *Id*.
>
> After Stinson told the operator she did not need an ambulance and she did not know where the defendant went, the operator told Stinson to stay inside the store.  *Id*.  About 14 minutes later, at 9:36 p.m., Jayson Moon called 911 and reported to the operator he was calling from an apartment.  *Id. at 168-169*.  He said he heard three gunshots and ran.  *Id. at 169*.  He did not see who had shot the gun.  *Id*.  The dispatcher told Moon the police were on the way and he hung up.  *Id*.
>
> Moon described himself as a longtime friend of Williams,[1] having known her for about six years.  *Id. at 191-192*.  He said he was with or around Stinson on the day she was killed.  *Id. at 192*.  He had seen her often whenever he visited Williams.  *Id. at 192-193*.  On the day Stinson was killed, Moon drove over to Williams' house.  *Id. at 193*.
>
> There were a lot of people there when he arrived that afternoon.  *Id*.  Moon was

---

[1]"Williams" refers to Tiffany Williams, Stinson's neighbor.

drinking as well as were the other people.  *Id*.  He got drunk.  *Id. at 195*.  He and Stinson after it got dark left the party to go to the store.  *Id*.  Stinson wanted to get something else to drink.  *Id. at 196*.  It was Stinson's idea to go to the store, but Moon went along because he, too, wanted something else to drink.  *Id*.

On the way, Stinson stopped at her house.  *Id*.  Moon thought she wanted to get some shoes.  *Id. at 196-197*.  The two of them walked to the store, taking Porter and Cooper streets.  *Id. at 197*.  Moon could not remember the name of the store.  *Id*.

Close to the exit of Blair Park, Stinson had a confrontation with another person.  *Id. at 198-199*.  Moon did not know the other person.  *Id. at 199*.  The other person got out of a car.  *Id*.  Stinson and the other person talked, and then both got a little loud.  *Id. at 199-200*.  They were both upset.  *Id. at 200*.  Moon stopped to wait for Stinson.  *Id. at 201*.  The two did not get physical with one another, but rather they had loud, angry voices.  *Id*.  It lasted two minutes, if that.  *Id. at 202*.

The other person left.  *Id*.  Stinson and Moon continued to walk to the store.  *Id*.  Stinson was upset and angry.  *Id*.  Moon did not in court see the other person.  *Id. at 202-203*.  Nor could he remember anything Stinson said after the other person left.  *Id. at 203*.  Stinson at the store called the police.  *Id*.

Moon went to the cooler inside the store.  *Id. at 204*.  Moon did not hear what Stinson said to the police nor did he hear what she said to the store employees who were behind the counter.  *Id*.  He did not know how long Stinson talked to the police.  *Id*.  Moon was still drunk.  *Id*.  He bought a beer.  *Id. at 205*.  Stinson bought more liquor.  *Id*.

At first, Stinson and Moon waited for the police, but then Stinson got up and decided to leave the store.  *Id*.  She did not say why, but just left.  *Id*.  Moon left with her.  *Id.*  They went back toward Stinson's house.  *Id. at 206*.  Stinson seemed kind of upset like she did not want to be bothered.  *Id*.  Moon walked about 5-6 feet behind Stinson.  *Id*.  They did not talk.  *Id. at 206-207*.

When they got to a driveway on Porter Street at an entrance to Blair Park, Moon heard three gunshots and saw sparks from his right.  *Id. at 207*.  He ran to his left straight past.  *Id*.  Just before he heard the shots, Moon heard a rustle from some bushes or trees to his right.  *Id. at 207-208*.  He did not see the person who fired the shots.  *Id. at 208, 219*.  He saw the flash and heard the shots.  *Id. at 208*.

Moon ran because he was unarmed and scared.  *Id*.  He did not see what happened to Stinson.  *Id*.  There was only one way to which Moon could run.  *Id. at 209*.  That was toward the direction from which the shots were fired.  *Id*.  He got on the grass and ran to Williams' house.  *Id*.  He got there fast.  *Id*.

It was dark and [there were] few people outside at the apartment complex as he ran into there.  *Id. at 209-210*.  At Williams' house, Moon told everyone there what had happened and told someone to call the police.  *Id. at 210*.  He did not see Stinson again.  *Id*.  He talked to the police that night and was at first treated as a suspect.  *Id*.  He cooperated with the police and by the end of the evening he was released and allowed to go home.  *Id. at 211*.

The police swabbed Moon's hands to find out if there was any gunpowder residue on them.  *Id*.  Moon denied he had a gun and also denied he had shot Stinson.  *Id*.  He claimed he did not know who shot her.  *Id*.  He said he showed the police the

4

place from which he said the gunshots had come. *Id. at 211-212*.

A clerk at the North Side Party Store, Amanda Lynn Schweda, worked the 3-11 p.m. shift on September 5, 2002, and knew Stinson and the defendant as customers of the store. *Id. at 223-225*. The defendant had come into the store earlier while it was still light out. *Id*. The defendant bought a six-pack of beer, and she and Schweda did not talk to one another. *Id*.

When Stinson came in later, Schweda said she was upset and wanted to use the phone to call the police. *Id. at 226*. She said she had just been attacked by the defendant. *Id*. She did not talk to Schweda, but just spoke with a man who was with her. *Id*. She used the phone and left. *Id*. She did not stay very long. *Id*.

Schweda did not know the man who was with Stinson. *Id. at 227*. She described him as a tall, black man. *Id*. Schweda said Stinson bought some liquor, but did not know if the man had done anything else. *Id*. She was pretty busy at the time. *Id*. They stayed in the store less than 10 minutes. *Id. at 228*. Schweda thought it was weird that Stinson had called the police and told them to meet her at the store, but then left before they came. *Id*.

Another North Side Party Store clerk, Devon Morris, knew Stinson and the defendant as frequent store customers. *Id. at 232-233*. Morris waited on Stinson on September 5, 2002, at around 4:30 p.m. *Id*. at 233. She made a purchase and left the store. *Id*. Sometime between 6-7 p.m., Morris saw the defendant in the store, but did not wait on her. *Id. at 233-234*. She left. *Id. at 234*.

At around 9:15 to 9:30 p.m., Stinson came back into the store and said the defendant had punched her in the mouth. *Id. at 234*. Upset and angry, Stinson said she need to call the police. *Id*. She was with somebody. *Id*. Morris could not describe that person. *Id*. After calling the police, Stinson bought a fifth of Five O'Clock gin and a half gallon of orange juice. *Id*. at 235. She made the same purchase earlier that day. *Id*.

A 4-1/2-year veteran patrol officer working for the Jackson Police Department (JPD), Robert Noppe on September 5, 2002, was dispatched to the North Side Party Store on a reported assault and battery involving Stinson and the defendant. *Id. at 284, 292-293*. When Noppe got to the intersection of Porter and Cooper Streets, he heard a series of 3-4 gunshots and pulled his patrol car into a gas station near there. *Id. at 294*. He reported to central dispatch what he had heard. *Id*. He looped into and out of the parking lot and drove into another parking lot nearby. *Id*. He saw somebody coming around a building. *Id*.

The person he say coming around the building was wearing a black shirt and was jogging at a slow trot tight alongside the building. *Id. at 295*. Noppe got out of his patrol car and told the person to stop. *Id*. The person did not stop, turned to Noppe, and yelled: "No, I'm not going to stop. There's people shooting down there. There's people running toward Blair Park. You need to go down there." *Id*. The person pointed back to Blair Park and at the same time kept going west. *Id*.

Nopped walked and then trotted to catch up to the person. *Id*. He yelled a number of times: "No. Stop. You've got to stop. Stop. Police." *Id. at 295-296*. They started jogging. *Id. at 296*. They moved faster as they took off. *Id*.

Noppe called central dispatch and reported he was in a foot chase with a black

5

male and described what he was wearing. *Id. at 297*. Noppe slowed a bit to let traffic by on Cooper Street and caught back up with the man in the side yard of 1428 Cooper. *Id*. When he was 15-20 feet behind the man, Noppe again yelled: "Stop. Police." *Id. at 298*. As the man turned around the corner at the house, he put his hands down to his waist as if he were trying to get something into or out of his pants. *Id*. The man started hopping around the corner of the building. *Id.*

Noppe drew his gun. *Id. at 298-299*. He yelled to the man: "Stop. Drop it. Get on the ground. Get on the ground." *Id. at 299*. It was pitch black out. *Id*. He lost sight of the man until his eyes adjusted to the dark. *Id*. He saw all of a sudden a silhouette after twice ordering the man to get down. *Id*. The man was motionless. *Id.* Noppe two more times ordered the man to get down and also ordered him to drop it. *Id.*

The man slowly turned and started moving again, this time back toward Porter Street. *Id. at 299-300*. Noppe again began yelling: "Get on the ground." *Id. at 300*. The man stopped and said: "It's just a phone. I have a phone. I'm calling my mom to let her know what's going on here." *Id*.

Noppe caught up with the man and said it was the defendant, whom he identified in court as the person he had chased. *Id. at 300-301*. He grabbed her arm and she tried to pull away, saying: "I didn't do anything wrong. What are you doing? Don't do anything wrong." *Id. at 300*. As she pulled away, Noppe pulled her arms back and handcuffed the defendant. *Id*. Noppe corrected his earlier testimony that day and said the defendant that night was wearing a red, rather than a black, shirt. *Id. at 295, 301*.

Noppe walked the defendant to his patrol car. *Id. at 302*. He reported to central dispatch he had a woman, not a man, in custody. *Id*. The defendant on the way to the patrol car told Noppe her name. *Id*. He put her in the back seat of the patrol car. *Id*. He heard other units report that they had a person down who needed medical attention. *Id*. Noppe saw cars gathering near the entrance to Blair Park. *Id*.

Noppe moved his patrol car closer to the crime scene. *Id. at 303*. He rolled his window down and got out of the car. *Id*. He walked over to the side of the car where defendant was sitting and she was still yelling: "I didn't do anything." *Id*. She was very upset. *Id*. Noppe tried to calm her down, then pulled out a Miranda card and read the defendant her rights. *Id.*

Noppe claimed the defendant understood her rights. *Id*. He pointed to all the cars gathering and thought there might be something on the ground. *Id*. He pointed in that direction and asked the defendant: "Who's that?" *Id*. Noppe said the defendant replied: "Stephanie." *Id*. Noppe estimated they were 30 yards away from Stinson. *Id*. Noppe had a patrol-car videotape of parts of before and after of the defendant's arrest that was admitted into evidence and played for the jury. *Id. at 304-309.*

Searching later the area where he had chased the defendant, Noppe with his flashlight found a black gun laying on top of a pile of white rocks outside of a house where he earlier had seen the defendant standing. *Id. at 311-312.*

Meanwhile, JPD Officer Mark Easter responded to a call of shots fired in the area of Blair Park. *Tr Trial Proceedings of 4-23-02, Vol II, 424-426*. On the way to Blair Park, he saw Stinson lying on her back with her feet on Porter Street and her

head near the sidewalk. *Id. at 426*. He stopped and asked her if she was okay. *Id*. She did not respond. *Id. at 426*. Easter called for an ambulance and for a rescue squad. *Id*. He stayed with Stinson waiting for them to arrive. *Id*. at 427.

Easter was also an evidence technician. *Id. at 427, 429*. He collected all the evidence and put it into the property room. *Id. at 427*. That night, after the fire department lighted the area, Easter took measurements and placed stake grids on the ground to take photographs of the area and collect evidence. *Id. at 428-429*. He had evidence preserved for prints and wore rubber gloves to pick up the 0.380 black semi-automatic gun the police found behind the house at 1428 Cooper Street. *Id. at 429-430*. Easter found there was one bullet in the chamber and two rounds in the magazine of the gun they found. *Id. at 431-432*. There were two different manufacturers of the rounds found inside the gun, R & P and Winchester. *Id. at 432*.

The police found three shell casings during their evidence search that night, two on the driveway of Blair Park and the other further north at the beginning of the driveway to Blair Park and Porter Street. *Id. at 433*. The two casings found on the driveway were 20-30 feet from Stinson's body. *Id. at 434*. The third casing was found about 10 feet from her body. *Id*. The police marked the casings and used a laser distance measuring device to map and photograph the area. *Id. at 435*. They placed the items found on a diagram that was not drawn to scale and included other items found as well, including a crack pipe and blood droplets. *Id. at 436-437, 440-442*.

Noppe took the defendant to the police station where she was booked and where a gun powder presence test was done. *Id. at 333-337*. The police found no gun powder residue on either Moon or the defendant. *Id. at 337*. DNA tests, too, were negative, except for the beer can on which was found a man's DNA. *Id. at 480-481*.

Def.-Appellant's Br. on App., in *People v. Norris*, No. 248784 (Mich. Ct. App.), at 8-16 [hereinafter "Def.'s App. Br."]. In addition to this testimony, the prosecutor introduced the testimony of the forensic pathologist, who testified as to the injuries sustained by Stinson. *See* Trial Tr., Vol. II, at 366-97. Further, Rhonda Smith testified that Stinson and petitioner had a volatile relationship, and that in July 2002 she witnessed petitioner threatening to kill Stinson if Stinson was seeing someone else. *See id*. at 507-08. On the morning of the murder, she heard petitioner threaten to kill Stinson. *See id*. at 509. Smith also testified that on one occasion she saw Stinson with cuts on her face, and Stinson indicated that petitioner had put a knife to Stinson's throat and threatened to kill her. *See id*. at 589. Walter McCan testified that petitioner had threatened to kill both him and Stinson on several occasions when he and Stinson were together, and that Stinson had told him that petitioner was trying

to kill her.  *See id.* at 600-06.

Petitioner's appellate brief also summarizes the testimony presented by her in support of her

defense:

> The defendant in May 2002 started a homosexual relationship with Tonya Williams. [Trial Tr., Vol. III, at 630-31].  They lived together from the end of May until August 2002.  *Id. at 631*.  Williams moved out in August and moved back to her home on Ganson Street.  *Id.*  When they lived together, Williams and the defendant were around each other all day long, except when Williams was at work.  *Id. at 632, 634*.  Williams never heard the defendant call anyone and yell or act at them.  *Id.*  Williams said she did not know Stinson and never heard the defendant talk to her on the phone or otherwise.  *Id. at 634*.  She was with the defendant on August 8, 2002, at the Jackson County Fair and said nothing happened of any note at the fair.  *Id. at 636*.
>
> Stinson did not like the defendant's daughter, Tunisia, who was 15 years old.  *Id. at 648, 649*.  Stinson was always trying to get the defendant to put Tunisia in a foster home.  *Id.*  Norris had to get Tunisia off to school and sometimes Tunisia's grandfather had to take her to school because the defendant was always busy taking care of Stinson's children.  *Id.*
>
> Norris knew Stinson had a "big problem drinking."  *Id.*  She warned Stinson about drinking when she was also taking medication, but Stinson did not pay attention to her.  *Id. at 648-649*.  Norris told Stinson: "You can't be drinking, because all it [does] is just stop your medication from working, you know."  *Id. at 649*.
>
> The defendant's sister, Vanessa Norris confirmed that Stinson and the defendant were lovers.  *Id. at 653*.  Vanessa saw Stinson and the defendant together all the time and said they came over to her house all the time.  *Id. at 654*.  Stinson's youngest daughter, Tiara, used to come over to Vanessa's house and spend the night.  *Id.*  When Vanessa worked, Stinson and the defendant came over and watched the children or would pick her up from work.  *Id.*  Stinson brought her grandchildren over with her.  *Id.*
>
> Around Vanessa, Stinson and the defendant got along, laughed, and talked.  *Id. at 654-655*.  They came together to family parties at her house.  *Id. at 655*.  Vanessa brought to court photographs to be admitted into evidence and shown to the jury of Stinson and the defendant together and of Stinson at different parties and holidays from 1999 and into 2002.  *Id. at 655-657*.

Def.'s App. Br., at 16-18.

C.     *Procedural Default*

Respondent first contends that petitioner's claims are barred by petitioner's procedural default

in the state courts, because petitioner failed to timely appeal her claims to the Michigan Supreme

Court.  The Court should decline to resolve this issue, and instead should address the claims on the merits.

Pursuant to MICH. CT. R. 7.302(C)(2), petitioner's application for leave to appeal was due 56 days from the decision of the court of appeals.  Because the court of appeals issued its decision on October 5, 2004, petitioner's application for leave to appeal was due on December 1, 2004.  Petitioner contends that she gave her application for leave to appeal for prison officials to mail on November 22, 2004.  Despite this, the application was not received (or recorded to have been received) by the Clerk until January 4, 2005.  Depending on the circumstances which resulted in the late delivery of his application for leave to appeal, that delayed delivery may constitute cause to excuse petitioner's procedural default.  *See, e.g.*, *Maples v. Stegall*, 340 F.3d 433, 439 (6th Cir. 2003); *Ivy v. Caspari*, 173 F.3d 1136, 1141 (8th Cir. 1999); *Alexander v. Dugger*, 841 F.2d 371, 373 (11th Cir. 1988).  A resolution of this question, however, entails a consideration of factors which are not apparent from the record.  Because, as discussed below, petitioner's claims are without merit, the Court should resolve the petition on this basis rather than addressing the procedural default issue.  *See Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis because resolution of the default issue would require remand and further judicial proceedings); *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted) ("[J]udicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated.").  *See generally*, *Trest v. Cain*, 522 U.S. 87, 89 (1997) (procedural default doctrine is not jurisdictional).

D.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, her petition is governed by the

provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state

court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.    *Sufficiency of the Evidence (Claim I)*

Petitioner first contends that the prosecution presented insufficient evidence to establish her guilt beyond a reasonable doubt. The Court should conclude that petitioner is not entitled to habeas

relief on this claim.

1.    *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court

12

must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d

91, 97 (2d Cir. 1999).

Under Michigan law, the common law crime of murder is defined as second degree murder,

and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317.  To establish second

degree murder, the prosecution must show that the defendant killed a human being with malice

aforethought.  In order to show malice aforethought, the prosecution must establish one of three

mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to

commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with

the knowledge that death or great bodily harm is the probable result.  *See People v. Dykhouse*, 418

Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d

304, 319-20 (1980).

Under Michigan law, "[f]irst-degree murder is second-degree murder plus an added

element[.]" *People v. Johnson*, 105 Mich. App. 498, 502, 307 N.W.2d 357, 359 (1981), *rev'd on other

grounds*, 414 Mich. 899, 323 N.W.2d 5 (1982).  Specifically, first degree murder is a second degree

murder which also is committed: (a) during the commission of an enumerated felony; (b) with

premeditation and deliberation; (c) by means of poison or lying in wait; or (d) against a peace or

corrections officer during the course of his employment.  *See* MICH. COMP. LAWS § 750.316.

2.     *Analysis*

Petitioner contends that there was insufficient evidence presented that she was the person who

killed Stinson.  The Michigan Court of Appeals rejected this claim, reasoning:

> In the instant case, the prosecution offered a significant amount of
> circumstantial evidence tending to show that defendant killed the decedent.  It
> presented a recording of a 9-1-1 call, received a few minutes before the decedent's
> death, in which she complained that defendant had just assaulted her. And it called two
> witnesses who placed defendant near the scene of the crime at the time the shooting

13

occurred.

Additionally, Officer Robert Noppe of the Jackson Police Department testified that, just after the shooting, he saw defendant attempting to leave the area. When he ordered her to stop, she fled. Officer Noppe further testified that he observed defendant reaching towards her waist as she ran as if trying to get something out. After capturing her, he discovered a pistol along the path defendant took when she fled.

Furthermore, the medical examiner testified that a pair of gunshot wounds caused the decedent's death and that both bullets were recovered from the body. A detective from the Jackson Police Department testified that ballistics tests were conducted on these bullets and it was determined that they were fired from the gun discovered by Officer Noppe.

Based on the evidence presented, a rational jury could infer that it was defendant who shot the decedent.

*Norris*, 2004 WL 2238593, at *1-*2, slip op. at 2. The Court should conclude that this determination was reasonable.

Contrary to petitioner's argument, the fact that there was no physical evidence, such as fingerprints or gunshot residue, and no eyewitness, does not render the evidence insufficient. "Identity may be proved through inference and circumstantial evidence." *United States v. Ferguson*, 211 F.3d 878, 884 (5th Cir. 2000); *accord United States v. Anglin*, 169 F.3d 154, 159 (2d Cir. 1999); *Dell v. Straub*, 194 F. Supp. 2d 629, 647-48 (E.D. Mich. 2002) (Friedman, J.). Here, there was evidence that petitioner was in the area of the murder, that she threw away the gun which was positively identified as the murder weapon, and that there was hard feelings between petitioner and the victim, which included death threats by petitioner and a physical altercation on the day of the murder. These pieces of circumstantial evidence, if believed by the jury, were sufficient to establish petitioner's identity as the perpetrator beyond a reasonable doubt. *See People v. Malone*, 193 Mich. App. 366, 372, 483 N.W.2d 470, 473 (1992) (evidence that defendant was at the scene of the murder, was seen by at least one witness carrying a gun, and that there were hard feelings between the victim and the defendant sufficient to establish defendant's identity as the shooter). Further, this conclusion

14

is not altered by the alleged inconsistencies in the witnesses' testimony. It is the job of the finder of fact, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the trial court resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996); *see also*, *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story.").

Accordingly, the Michigan Court of Appeals's resolution of this claim was reasonable, and the Court should therefore conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Evidentiary Claims (Claim II)*

Petitioner next contends that she was denied a fair trial by the introduction of various testimony. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Prior Bad Acts Evidence*

Petitioner first contends that she was denied a fair trial by the introduction of prior bad acts evidence. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

a.    *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A]

15

federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

### b. Analysis

Petitioner contends that she was denied a fair trial by the introduction of evidence of her prior bad acts, specifically testimony relating to her prior threats to and assaults on Stinson. The Court should conclude that petitioner is not entitled to habeas relief on this claim. As noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction of this evidence. This being the case, petitioner is not entitled to habeas relief even if the evidence was not properly admitted under Rule 404(b). Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is

16

not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974). Thus, the only question is whether the Michigan Court of Appeals's determination that the evidence was relevant was reasonable. The Court should conclude that this determination was reasonable. As the court explained, the evidence was relevant to show petitioner's intent to kill Stinson, a necessary element of the charge. *See Norris*, 2004 WL 2238593, at *3, slip op. at 3-4. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.      *Confrontation Clause and Hearsay Evidence*

Petitioner also contends that she was denied her right to confront the witnesses against her by the introduction of the victim's various hearsay statements. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

a.   *Clearly Established Law*

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause is applicable to the states through the Fourteenth Amendment's Due Process Clause. *See Pointer v. Texas*, 480 U.S. 400, 406 (1965). At the time of petitioner's trial and direct appeal, the standard governing the admissibility of hearsay statements under the Confrontation Clause was that set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). In *Roberts*, the Court explained that the underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, *i.e.*, to exclude unreliable, out-of-court statements in criminal proceedings. Thus, the Court reasoned:

In sum, when a hearsay declarant is not present for cross-examination at trial,

17

> the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66.

As the Court explained in *Roberts*, reliability is inferred if the evidence was admitted pursuant to a firmly rooted hearsay exception. The theory behind this presumption is that these firmly rooted exceptions represent judgments, based on history and practice, that statements made in certain circumstances are inherently trustworthy such that the "adversarial testing [embodied in the Confrontation Clause] would add little to [their] reliability." *Idaho v. Wright*, 497 U.S. 805, 821 (1990). Thus, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid foundations that admission of virtually any evidence within [the exception] comports with the substance of constitutional protection." *Roberts*, 448 U.S. at 66 (internal quotation omitted).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court abrogated *Roberts* as applied to testimonial hearsay statements. After surveying the historical development of the Confrontation Clause and the jurisprudence interpreting it, the Supreme Court concluded that, under a proper understanding of the Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. The Court then explained that *Roberts*'s allowance of testimonial statements based on their reliability, where there has been no opportunity for cross-examination of the declarant, departed from this proper understanding of the Confrontation Clause. *See id.* at 60-68. The Court therefore abrogated *Roberts* as applied to testimonial hearsay statements, concluding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes:

18

confrontation." *Id*. at 68-69.

### b. *Analysis*

The Court should first conclude that petitioner's claim is governed solely by the *Roberts* framework. As explained above, *Crawford* abrogated *Roberts* only with respect to "testimonial" hearsay statements. The Court explicitly left untouched the application of *Roberts* to cases involving nontestimonial hearsay: "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does *Roberts*, and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether." *Crawford*, 541 U.S. at 68. As the courts applying *Crawford* have observed,

> [t]he lynchpin of the *Crawford* decision thus is its distinction between testimonial and nontestimonial hearsay; simply put, the rule announced in *Crawford* applies only to the former category of statements. . . . [U]nless a particular hearsay statement qualifies as "testimonial," *Crawford* is inapplicable and *Roberts* still controls.

*United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005); *see also*, *Horton v. Allen*, 370 F.3d 75, 83-84 (1st Cir. 2004); *United States v. Johnson*, 354 F. Supp. 2d 939, 964 (N.D. Iowa 2005); *United States v. Savoca*, 335 F. Supp. 2d 385, 391-92 (S.D.N.Y. 2004).

In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68. The Court did, however, provide some guidance. Specifically, the Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

19

*Id.* at 51-52 (internal quotations and citations omitted); *see also*, *Hendricks*, 395 F.3d at 179-80; *Horton*, 370 F.3d at 84. While the Court declined to adopt any of these three formulations, the Court noted that the term "testimonial," whatever else it may cover, "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68. Here, it is clear that the victim's statements, consisting of statements to friends and her excited utterances to the 911 operator, were not "testimonial" under any of the three formulations recognized in *Crawford*. *See United States v. Hadley*, 431 F.3d 484, 503-06 (6th Cir. 2005) (opinion of Rosen, J.) (discussing weight of authority supporting view that spontaneous statements to 911 operators are not "testimonial" under *Crawford*); *United States v. Franklin*, 415 F.3d 537, 545-46 (6th Cir. 2005) (citing cases) (casual statements to family and acquaintances nontestimonial under *Crawford*).

Thus, the only question is whether the nontestimonial hearsay which was admitted bore adequate indicia of reliability under *Roberts*. As noted above, reliability can be established, without more, where the hearsay is admitted pursuant to a firmly rooted hearsay exception. In this case, the evidence was admitted pursuant to the state of mind exception found in MICH. R. EVID. 803(2). It is well-established that the state of mind exception to the hearsay rule is a firmly established exception for Confrontation Clause purposes. *See Horton v. Allen*, 370 F.3d 75, 84 (1st Cir. 2004); *Yucel v. Berghuis*, 86 Fed. Appx. 918, 919 (6th Cir. 2004); *Terronova v. Kincheloe*, 852 F.2d 424, 427 (9th Cir. 1988); *United States v. Johnson*, 354 F. Supp. 2d 939, 964 (N.D. Iowa 2005); *Frazier v. Mitchell*, 188 F. Supp. 2d 798, 812-13 (N.D. Ohio 2001), *rev'd in part on other grounds sub nom. Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003). Thus, there was no Confrontation Clause violation by the introduction of this evidence, and the Court should conclude that petitioner is not entitled to habeas relief on this claim.

20

G.      *Jury Instructions (Claim III)*

Petitioner next contends that she was denied a fair trial by the trial court's instructions to the jury. First, she contends that the court erred in failing to give her requested instruction on the hearsay statements made by Stinson. Second, she contends that the court should have instructed on voluntary manslaughter as a lesser included offense. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

In order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57 F.3d 1419, 1429-30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct criminal appeal). As the Supreme Court noted in *Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). If an instruction is ambiguous and not necessarily erroneous, it can run afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & 73 n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990). In short, instructional errors of state law will rarely form the basis for federal habeas corpus relief. *See Estelle*, 502 U.S. at 71-72.

2.      *Analysis*

a.  *Hearsay Testimony Instruction*

21

At trial, defense counsel requested that the trial court give the following instruction to the jury on hearsay and other acts evidence, as quoted by the trial judge:

> The statements of witnesses, including Ella Jean Blackwell, Nakia Smith, Rhonda Smith, Officer Charles Brant and Walter McCan, contained hearsay statements regarding other events. These are not in regard to the Defendant – excuse me – these are in regard to the victim and the accused.
>
> Generally, these statements and the testimony in regards to these other events would not be admissible. Here, the Court is allowing them in. These are being admitted to help in determining the relevant – the relevant states of mind of the parties on September 5, 2002. The only relevant date for you determination – final determination is the date of the homicide.
>
> If you find the descriptions of what was said and of the prior incidents to be truthful, then you may use them to whatever extent you believe is appropriate. These are still hearsay and testimony of other events. They are not direct evidence of the events of evening hours of September 5, 2002.
>
> I state again that you are the determiners of the facts of this case. You may use any admitted evidence to the extent you feel it is relevant to your final determination in regard to the facts and issues presented in this trial.

Trial Tr., Vol. III, at 668-69. The trial court determined that Standard Criminal Jury Instruction (2d) 4.11 adequately covered the matter, and instructed the jury in accord with the standard instruction:

> You've also heard evidence that was introduced to show that the Defendant committed crimes or improper acts for which she is not on trial. If you believe this evidence, you must be very careful, again, only to consider it for certain purposes.
>
> You may only think about whether this evidence tends to show that the Defendant made previous threats of violence and/or committed previous assaultive acts against the deceased and establishes motive, intent, opportunity or preparation, as well as absence of mistake or accident.
>
> You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the Defendant is a bad person or that she is likely to commit crimes. You must not convict the Defendant here because you think she is guilty of other bad conduct. All the evidence must convince you beyond a reasonable doubt that the Defendant committed the alleged crime, or you must find her not guilty.

*Id*. at 744-75. The Michigan Court of Appeals rejected petitioner's claim, reasoning that the court's instruction "properly explained the extent to which the jury could use the evidence of defendant's prior bad acts," *Norris*, 2004 WL 2238593, at *4, slip op. at 4, and that the portions of petitioner's proposed instruction addressing hearsay misstated the law because, once evidence is admitted under

22

an exception to the hearsay rules, it is admissible as substantive evidence. *See id.* The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner fails to explain how the court's failure to give her requested instruction deprived her of a fair trial. As the Michigan Court of Appeals explained, the instruction given adequately instructed the jury on the consideration it could give to other acts evidence, and that the jury could not convict petitioner solely because it viewed petitioner as a bad person. *See Adams v. Smith*, 280 F. Supp. 2d 704, 723 (E.D. Mich. 2003) (Tarnow, J.). Further, the portion of petitioner's instruction regarding hearsay was a misstatement of the law, because it is well established that, once properly admitted under a hearsay exception, such evidence may be used as substantive evidence of guilt. *See People v. Poole*, 444 Mich. 151, 159, 506 N.W.2d 505, 509 (1993); *cf. Fireman's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1311 n.10 (8th Cir. 1993) ("If a hearsay exception applies, the statement may be admitted as substantive evidence."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b.  Voluntary Manslaughter Instruction

Petitioner next argues that she was denied a fair trial when the court failed to give an instruction on voluntary manslaughter as a lesser included offense of murder. The Court should conclude that petitioner is not entitled to habeas relief on this claim, for three reasons.

First, petitioner's claim is not cognizable on habeas review. As the Sixth Circuit has noted, even where a lesser offense instruction is requested, the failure of a court to instruct on a lesser included or cognate offense in a non-capital case is generally "not an error of such magnitude to be cognizable in federal habeas corpus review." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc); *accord Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998); *Lujan v. Tansy*, 2 F.3d 1031, 1036 (10th Cir. 1993). At a minimum, "no clearly established Supreme Court authority requires

lesser-included offense instructions in non-capital cases. Thus, under the AEDPA, this claim is not a basis for habeas relief." *Samu v. Elo*, 14 Fed. Appx. 477, 479 (6th Cir. 2001) (citation omitted); *see also*, *Adams v. Smith*, 280 F. Supp. 2d 704, 717 (E.D. Mich. 2003) (Tarnow, J.).

Second, the Michigan Court of Appeals determined that an manslaughter instruction was not warranted under Michigan law, *see Norris*, 2004 WL 2238593, at *4, slip op. at 5, and this determination was reasonable. Under Michigan law "[m]anslaughter is murder without malice." *People v. Mendoza*, 468 Mich. 527, 534, 664 N.W.2d 685, 689 (2003). "Murder and manslaughter are both homicides and share the element of being intentional killings. However, the element of provocation . . . characterizes the offense of manslaughter [and] separates it from murder." *People v. Pouncey*, 437 Mich. 382, 388, 471 N.W.2d 346, 350 (1991). Thus, "[u]nder Michigan law, 'voluntary manslaughter is an intentional killing committed under the influence of passion or hot blood produced by adequate provocation, and before a reasonable time has passed for the blood to cool and reason to resume its habitual control.'" *Todd v. Stegal*, 40 Fed. Appx. 25, 29 (6th Cir. 2002) (quoting *People v. Fortson*, 202 Mich. App. 13, 19, 507 N.W.2d 763, 767 (1993)). In other words, "to show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *Mendoza*, 468 Mich. at 535-36, 664 N.W.2d at 690.

Not every form of provocation, however, will suffice to negate the malice necessary for murder. As the Michigan Supreme Court has explained,

> [t]he provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason. . . .
>
> In addition, the provocation must be adequate, namely, that which would cause the reasonable person to lose control. Not every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter. The law cannot countenance the loss of self-control; rather, it must encourage people to control their passions.

24

*Pouncey*, 437 Mich. at 389, 471 N.W.2d at 350; *see also*, *People v. Sullivan*, 231 Mich. App. 510, 518, 586 N.W.2d 578, 582 (1998).  Here, as the Michigan Court of Appeals explained, there was evidence of a confrontation between petitioner and the victim.  However, there was no evidence that the victim had provoked the confrontation; on the contrary, the evidence suggested only that petitioner was the initial aggressor, a fact which renders manslaughter inapplicable.  Further, there was a significant lapse of time between the confrontation and the shooting of Stinson.  This evidence negates any finding of voluntary manslaughter.  *See Todd*, 40 Fed. Appx. at 29; *Draughn v. Jabe*, 803 F. Supp. 70, 76 (E.D. Mich. 1992) (Gadola, J.), *aff'd*, 989 F.2d 499 (6th Cir. 1993) (unpublished); *Pouncey*, 437 Mich. at 392, 471 N.W.2d at 351 ("After a few insults were exchanged, the defendant went into the house, a safe harbor.  There was no evidence that the defendant was compelled to go back outside by anyone. . . .  Instead, the defendant chose to retrieve the shotgun from the closet in the back of the house and chose to go back outside.").

Finally, petitioner is not entitled to habeas relief on this claim because any error in failing to give the requested instructions was harmless because the trial court instructed the jury on second degree murder as a lesser included offense, but the jury nonetheless convicted petitioner of first degree murder.  As noted by one circuit court, the Supreme Court has recognized that "in cases involving offenses on a ladder, if the trial court wrongfully refuses to charge the offense at the bottom rung, that error is harmless provided the jury returns a guilty verdict for an offense higher up rather than for an intermediate offense which is also charged."  *Geschwendt v. Ryan*, 967 F.2d 877, 884 (3d Cir. 1992) (discussing *Schad v. Arizona*, 501 U.S. 624, 647-48 (1991)); *accord Six v. Delo*, 94 F.3d 469, 478 (8th Cir. 1996); *Allridge v. Scott*, 41 F.3d 213, 220 (5th Cir. 1994); *Slade v. Taylor*, 689 F. Supp. 595, 599 (E.D. Va. 1988).  Accordingly, because petitioner was convicted of the greater offense of first degree murder over the intermediate offense of second degree murder, petitioner was not

prejudiced by the trial court's failure to instruct on the lesser offense of  manslaughter.[2]  For these

reasons, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Denial of Application for Leave to Appeal (Claim IV)*

Finally, petitioner contends that the Michigan Supreme Court erroneously denied her

application for leave to appeal as untimely.  It is unclear from her petition whether petitioner is raising

this claim solely as cause to excuse her procedural default, or whether she is also asserting a

substantive claim for habeas relief.  To the extent that she is asserting a substantive claim for relief

on this basis, the Court should conclude that the claim is without merit.  The Constitution does not

require a state to establish a system of discretionary appeals, and thus any error in the Michigan

Supreme Court's application of its own rules does not state a federal constitutional claim cognizable

on habeas review.  *See United States ex rel. Watson v. Briley*, No. 01 C 9101, 2005 WL 736656, at

*11 (N.D. Ill. Mar. 31, 2005); *Smith v. Ohio Dep't of Rehabilitation & Correction*, 331 F. Supp. 2d

605, 622 (N.D. Ohio 2004).  Accordingly, the Court should conclude that petitioner is not entitled to

habeas relief on this claim.

I.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of

petitioner's claims did not result in a decision which was contrary to, or which involved an

unreasonable application of, clearly established federal law.  Accordingly, the Court should deny

---

[2]Furthermore, it should be noted that the same result is dictated by Michigan law.  *See People v. Beach*, 429 Mich. 450 (1988); *People v. Sullivan*, 231 Mich. App. 510, 586 N.W.2d 578 (1998), *aff'd*, 609 N.W.2d 193 (Mich. 2000); *People v. Raper*, 222 Mich. App. 475, 563 N.W.2d 709 (1997); *People v. Ross*, 73 Mich. App. 588, 252 N.W.2d 526 (1977).  Thus, the court of appeals' determination in this case that the trial court's failure to give petitioner's requested lesser offense instructions was harmless was not "arbitrary and unsupportable[,] . . . in clear defiance of state law," as is required to elevate a failure to give a lesser offense instruction to an error of constitutional magnitude.  *Bagby*, 894 F.2d at 795.

petitioner's application for the writ of habeas corpus.

III.   <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/Paul J. Komives                                      
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE

Dated: 3/27/06

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on March 27, 2006.
>
>                         s/Eddrey Butts          
>                         Case Manager